GEORGE F. BEMIS *vs.* ALBERT BECKER, JOSEPH A. FANNING, JOSEPH A. STOCKTON and DANIEL W. WHEELER.

The liability of simple receipts to be varied by oral evidence discussed.

The difference between simple receipts and receipts containing conditions, terms, agreements &c., noted.

The plaintiffs below, a firm, are estopped from setting up their ownership to property, where one of their firm—the managing agent thereof—makes representations that the property was bought on account of a third party, and that the interest of his firm in the property was limited by the amount advanced by them in the purchase thereof, and where, upon the faith of these representations, the defendants purchase the same of that third party.

Parol testimony of a witness, that he had examined the records of the recorder's office of a county and did not find the plat in question, of record there, if admissible, is necessarily unsatisfactory, and inconclusive evidence.

Certificates of registers of deeds adduced in proof of mere matter of fact, as, that there was not a copy of a certain map or plat of a city among the records of the county, are, by the rules of evidence, inadmissible. In general, " certificates of mere matters of fact, not coupled with matters of law, are not receivable in evidence."

The party desiring to prove that a town plat set forth and described the several streets, &c., according to the provisions of the law, should adduce the best evidence for that purpose, which is the plat itself produced in court by the proper custodian of the records, with which it was required to have been deposited.

A certificate providing that " B is entitled to one share, of ten lots, (numbered as per records and indorsements, in the city of Wyandotte, situated at the confluence of the Kansas and Missouri rivers, in the Wyandotte purchase, Kansas territory,) subject to the conditions of improvements within the city limits, to the value of —— dollars per share, within —— months from the date of this certificate, and the Wyandotte City Company is hereby pledged to give a good and valid deed of the same when all the lots shall have been drawn and the above conditions complied with," *held,* an agreement, contract or pledge to convey at a future time.

Though a deed of a share of ten lots in a town, without describing them, would clearly be void, for uncertainty, yet an agreement to make a deed for ten lots would be good and binding.

Where one state adopts a law from another, the judicial construction given to the statute in the state where it originated, follows it to the state of its adoption. This principle *held* applicable to an act concerning towns and cities, (*Stats.* 1855,) adopted from Missouri ; *held,* that whatever construction had

been given to that statute by the courts of Missouri, must be presumed to have been known and approved by the legislature of Kansas territory, when they incorporated that act into the body of Kansas laws.

*Held*, in accordance with the decision of the supreme court of Missouri, made prior to the enactment of that statute, that a sale of city lots, before the plat had been deposited in the recorder's office, *was not void*, but that *the title in the lots sold passed to the vendee.*

A similar decision on an almost identical statute, in *Strong vs. Darling*, (9 *Ohio*, 201,) commented upon.

Contracts in contravention of a statute are not to be held void, unless the court, from an examination of the statute, shall judge such to have been the intent of the legislature, though such intent will be presumed, unless the contrary can be fairly inferred.

Section five of the act concerning plats of towns and cities, (*Stats.* 1855, *p.* 734,) providing that "*any person*" who shall "sell, or offer for sale, such lots, shall forfeit three hundred dollars," construed as not to impose the penalty upon any except those upon which the act imposes the duty of acknowledging and depositing the plat.

Case of *Oneida Bank vs. Ontario Bank*, (21 *N. Y. R.*, 490,) as to contracts in contravention of statutes, commented upon. Also *Fackle vs. Ford.*

It is no part of the policy of such laws to encourage frauds, by releasing the fraudulent party from the obligation of his contract.

A statement of the facts of the case appears in the opinion of the court.

*Wilson Shannon and H. M. Simpson*, for plaintiff in error.

*Wilson Shannon* submitted :

I. The contract of sale of the three hundred and ninety-four sacks of flour, was a contract in writing, entered into by Delahay, by his agent Stockton, on the one part, and Bemis, the defendant below, on the other. The contract cannot be altered, varied or changed by parol evidence. The representations or statements of Stockton, one of the firm of Becker & Co., bind the firm. (*Story on Partnership*, 170; 2 *Barn. & Ald.*, 795; *Collyer on Partnership*, 297, 298; *Lucas vs. De la Coen, Maul & Selwin*, 250.)

The declarations and admissions of Stockton, so far as they constitute a part of the transaction, are the declarations and

admissions of Becker & Co., and they are estopped from saying now that they are not true. (3 *Phil. on Ev.* 369, 3*d ed.*, *and the authorities there referred to.*)

Parol evidence cannot be admitted to alter, vary or contradict a written contract. (*Parson's Commer. Law*, 22, 23, 24; 14 *Wend.*, 26; 2 *Starkie on Ev.*, 548, 558, 551.)

The rule is the same in equity as at law. (*Leading Cases in Equity, vol.* 2, *part* 1, *p.* 560.)

If the flour had proved defective in quality or title, or had not been delivered, who could Bemis have sued on this written contract, as proved in evidence? The answer is, "Delahay alone." A contract in form of a receipt cannot be contradicted by parol evidence. (6 *Ohio R.*, 246.)

A mere receipt for money or property is not a contract, but evidence of payment merely. It may, therefore, be contradicted by parol evidence, but not where a contract is embodied in it. The court was bound to disregard the parol evidence of Delahay, so far as it conflicted with the written contract.

The fifteen hundred dollar note of Ream & Funk, and the Wyandotte City share number one hundred and eighty-nine, were given in exchange by Bemis to Stockton, for the three hundred and ninety-four sacks of flour, and was payment in full, with the one dollar and seventy-five cents. (2 *Starkie on Ev.*, 186; *Smith's Commer. Law*, 622, *note; Ib.*, 624, *note;* 15 *Iowa R*, 241; 3 *Cowen R.*, 272.)

Neither Delahay nor Becker & Co. can move on this contract, until they have, for some legal reasons, rescinded the contract, and returned, or offered to return, the fifteen hundred dollar note and the Wyandotte share, number one hundred and eighty-nine. (*Crowe vs. Clay*, 25 *Eng. Law and Eq. Rep*,, 451; 6 *Hill R.* 340; 1 *Denio*, 73; 15 *Mass. R.*, 319; 6 *Ib.*, 324; 19 *N. H. R.*, 198.)

It is said the fifteen hundred dollar note of Ream & Funk was void. This I deny; but if void, it should be returned.

The sale of the Wyandotte City share by Bemis to Stockton, as detailed in the evidence, it must be admitted was not void. The sale took place on the 29th of March, 1858, and the city map had been deposited for record, with the proper officer, on the 19th day of May, 1857. The objection made to the note of Ream & Funk, which is dated 12th of March, 1857—that is, that the plat of the city had not been recorded—does not apply to the sale of the city share number one hundred and eighty-nine, made 29th of March, 1858.

But I deny that the note of Ream & Funk is void:

Because it was not given upon the sale of a *lot* in Wyandotte before the plat was recorded; but upon a contract to sell and convey at a future period, upon the payment to Bemis of fifteen hundred dollars, and before the time fixed for conveying the share and executing the contract, the plat was recorded. By this contract, did Bemis violate the statutes of 1855? (*P.* 734, § 5.)

The fifth section only applies to proprietors of the town, and to no other parties. (21 *Mo. R.* 391.)

What is meant by the sale of a lot? Not such a contract as is evidenced by a copy of the Wyandotte City share, in the bill of exceptions. No lots had been drawn and entered to this share in the books of the Wyandotte City company, on the 12th of March, 1857. No lots had been then indorsed on the share. There is no sale, therefore, of a lot. There is no claim that Bemis was one of the proprietors of the town of Wyandotte.

The selling of a town share or contracting to sell a town share is no violation of the act of 1855, in relation to town plats. Shares in a town company are frequently issued and sold before the land is purchased on which the town is proposed to be laid out. They are transferred from one to another all over the United States; and no one supposes he is violating a penal statute by selling them. Specific lots in a town must be sold, before the penalty of the act is incurred. The act of 1855 is penal, and must be construed strictly.

The act of 1855 does not prohibit the selling of a lot, except the prohibition implied by the penalty. This does not necessarily render a contract void. (12 *How.*, 80 *to* 85.)

If the legislature had intended to make the contract void, they would have so provided. (*Mo. Stat.*, 610, 611; 18 *Mo.*, 237; 4 *Barr.*, 2069; 3 *Tenn. R.*, 418; 1 *Bos. & Pul.*, 269; 7 *Taunt.*, 260; 11 *East.*, 180; 9 *Ohio*, 201, *in point.*)

The court erred in admitting in evidence the record of the case in Leavenworth county, in which J. A. Stockton was plaintiff and Ream & Funk were defendants. (2 *Phil. on Ev.*, *p.* 6; 1 *Greenleaf on Ev.*, §§ 522, 523, 528; 4 *Pet. R.*, 85, 86; 14 *John. R.*, 81; 4 *Hill R.*, 119; 1 *Starkie on Ev.*, 214, 215; 7 *John. R.*, 173; 3 *Bebb. R.*, 281-2.)

The court erred in admitting the parol evidence of Dela-hay, to prove what was and what was not the record in Leavenworth county.

*H. M. Simpson* submitted:

I. It has been decided by the supreme court of Missouri, that the penal clause of the Missouri law was intended to apply to the *propoietors* of towns alone. It is a well settled principle that where one state borrows a law from another, the judictal construction given to the statute in the state where it originated, follows it into that of its adoption. This rule has often been laid down by the supreme court of the United States.

It is not contended that Bemis was a town proprietor. It follows, therefore, that he was not within the penal clause of the law in question.

It will not be contended that a contract in contravention of a penal law is illegal in any case in which the prescribed penalty could not be enforced against the offending party. If it were an offense to sell a *lot*, it does not follow that the sale of a *share* would be an offense also. To *sell* is to do a *present* act. To *agree* to sell at some future time, which time

is to be determined by the act of the buyer, is in no sense a sale, and does not come within the penal clause of the law ; *nor is a barter* in any sense a sale.

The penalty named in the town plat law is sufficient as a punishment. It falls upon the offending party. To go further, and to say that a sale of lots is illegal in a town, the plat of which had not been filed according to law, would, in a majority of cases, damage the innocent party—the buyer— and benefit the offender.

The supreme court of the United States have decided that a contract in contravention of a penal law is not illegal, in the sense that it cannot be enforced in a court of law, unless the legislature plainly intended the law to have this effect. Can it be presumed that it was the purpose of the legislature to prohibit all real estate transactions in a town, the plat of which had not been filed according to law ? Such a prohibition would involve a practical exemption of all real estate in such towns from forced sale, either for debt or taxes ; for no person would purchase at public sale a parcel of land which he could not afterwards alienate at his will. Such a construction "impairs the obligation of contracts," as to mortgages of lands situate in towns of which the plat has not been filed. The taking or giving of such a mortgage in no way contravenes the law in question. And yet, such mortgages, though perfectly legal, would be utterly valueles to the owner, as the sheriff's sale of the mortgaged premises would be a farce.

Judge Comstock says, (*Oneida Bank vs. Ontario Bank*, 21 *N. Y. R.*, 495,) "there is no doubt a principle of the common law that illegal and prohibited contracts are void, without being so expressly declared by any statute. But there is another principle equally well ascertained and more beneficent in its results, that no party shall set up his own illegality or wrong to the prejudice of an innocent person. * * The logic of the law, and certainly its morality, are not opposed

to the doctrine that the legislature may prohibit the contract and punish the guilty parties, and yet leave the contract to stand in favor of innocent persons not included in the terms of the prohibition. This, I think, is the just result from the decision of this court in *Tracy vs Talmadge,* ( 14 *N. Y.,* 162,) and of the principles that underlie that decision."

II. But even if the contract between Bemis and the Wyandotte town company, had been illegal and void, Bemis would still have been at liberty to rescind, and recover of the town company the consideration originally paid for the share. This point is expressly decided in 21 *New York Reports,* (496, 497.) This right Bemis parted with and sold when he sold the certificate of share one hundred and eighty-nine. The holder of this certificate was vested with this right, and when this certificate came into the hands of Becker & Co., they were entitled to disaffirm Bemis' contract with the town company, as evidenced by the certificate, and recover the consideration originally paid by Bemis to said company. The sale of an instrument or security declared utterly void by the statute, transfers to the assignee all the right and privilege of the assignor. (21 *N. Y. R.,* 497.) Such assignment may even be by parol. ( *Willard's Eq. Jurisp.,* 462, *ed.* 1860.) " For example, a note or a bond may be void for usury, but being founded on some antecedent claim—a contract free from that taint—there may be a just and legal right to recover the original consideration. The note or bond may be sold, and it will be void, even in the hands of an innocent purchaser. But will it be pretended that the purchaser gets absolutely nothing ? It is impossible to doubt that he will stand in the shoes of the vendor." (21 *N. Y. R.,* 498. *See also, Tracy vs. Talmadge,* 14 *N. Y. R.,* 192.)

*S. W. Johnston,* for defendants in error.

.I. The petition and answer and the evidence given in behalf of both parties on the trial of this cause in the district court,

Bemis *v.* Becker and others.

show that the contract for the purchase and sale of the flour was made by parol, and that that which the counsel for the plaintiff in error claims to be a contract in writing, is merely a receipt.

The law upon the admissability of parol evidence to alter, vary, or explain written contracts, is not applicable to this case, the writing being a receipt. The twenty-third section of the code provides that " every action must be prrsecuted in the name of the real party in interest." The evidence of Delahay was competent on that point. The true rule would seem to be, that whilst parol evidence cannot be admitted to alter or change the *nature* or *extent of the obligation*, created by a written contract, it is competent for almost any other purpose.

The testimony of Delahay shows conclusively that he made a contract with Becker & Co. to carry the flour, as freight, from Jefferson City to Lawrence, and that to obtain the contract he risked one thousand dollars. It further establishes the fact that he had no control over or interest in the flour, beyond obtaining the freight, the amount of which depended upon the price of flour at Lawrence, and could not be ascertained until after the entire shipment had been sold.

II. The note of Ream & Funk was without consideration, and void, for the following reasons :

1. It was given in the execution of a contract made in violation of a penal law of the territory. (*Stat. of* 1855, *p.* 734, § 5; *Chitty on Contracts*, 232; *Downing vs. Ringer*, 7 *Mo.* 585; 1 *Kent*, 467 *and notes; Harris vs. Runnells*, 12 *Howard* 80; 4 *Peters* 436; 1 *Smith's Lead. Cases*, 501-2, *and authorities cited ; Springfield Bank vs. Merrick*, 16 *Mass.* 325; *Sedgiwck* 41 *to* 87.)

2. The pretended conveyance called "a share of ten lots," did not convey or "*affect the title*" to real estate in the city of Wyandotte or elsewhere. (*Stats.* 1855, *p.* 177, § 16; *Stats.* 1857, *p.* 1, § 1, *and as to this Statute see Wain vs Walters*, 2 *Smith's Lead. Cases*, 147.)

3 "The Wyandotte City company" was an organization unknown to the laws of Kansas, and could not purchase, sell or be invested with the title to real estate. It could not contract, transfer or convey property of any description, constituting a good or valuable consideration, for the payment of money. (*An. & Ames on Cor.*, 18, 66, 130; 1 *U. S. Digest*, § 591; *Lumbard vs. Aldrich*, 6 *N. H.*, 269; *Beach vs. Fulton Bank*, 3 *Wend.* 573.)

4. The note was given for "lots," described as "a share of ten lots in the city of Wyandotte," and this description is so vague and indefinite that the contract is void for uncertainty. (*Hilliard on Vendors*, 120, 121, 434, 440, 442; *Perkins et al., vs. Ramsey, et al.*, 5 *Wheaton*, 269; *Boardman, et al., vs. Reed, et al.*, 6 *Peters*, 328; 13 *Johnson*, 297.)

5. "The Wyandotte share" was a nude contract and void, because no consideration appears on the face of the contract, to have passed from Bemis to the Wyandotte City company. It could not be enforced under the statute of frauds. (*See Laws* 1857, *Chap.* 1; *Wain vs. Walters*, 2 *Smith's Lead. Cases*, 147, *and notes; 2 Denio*, 403; 10 *Wend.* 30.)

III. In the transfer of a note by the payee, there is an implied warranty that it was given for a legal and a good or valuable consideration.

On the sale of a land warrant there is an implied warranty of its validity, and in the indorsement of a note there is an implied guaranty of the comptency of the maker to contract.

The same principle applies to the transfer of a share in a town company or other association; and to the transfer of any agreement purporting to bind a "company" or corporation for the benefit of the party making the assignment or transfer. (2 *Blackstone*, 468; 3 *Kent*, 118; 2 *Kent*, 478, *note*; 1 *Parson's*, 234, 241; *Chitty on Bills*, 111, 141; *Story on Prom. Notes*, §§ 118, 120, 135; *Ogden vs. Sauders*, 12 *Whea-*

*ton,* 341 ; *Hughes vs. Wheeler,* 8 *Cow.,* 82 ; *Presbury vs. Morris,* 18 *Miss.,* 185 ; *Erwin vs. Downs,* 15 *N. Y.,* 1 *Smith,* 575; *Herrick vs. Whitney,* 15 *Johns.* 240.)

IV. It was the imperative duty of Bemis, before "he sold or offered for sale," a lot in Wyandotte, to know that the plat of "the city of Wyandotte" was of record, and the presumption of law is, that he made the sale to Ream & Funk with full knowledge of the facts, and the transfer of the note for a valuable consideration was therefore fraudulent, in law, and not good by way of barter or exchange or payment, for the reason that fraud vitiates every transaction tainted with it. (*Snyder vs. Findley, Code* 48 ; 3 *U. S. Digest* 125, § 109 ; 3 *U. S. Digest,* 122, § 38 ; 3 *Phillips on Ev.,* 106, 119, *notes; Baird vs. Brandon,* 2 *Nott & M'Cord,* 102 ; *Stafford vs. Bacon,* 1 *Hill,* 532.)

V. A note, void on account of usury or forgery, or by reason of the illegality of the consideration, is not good or sufficient as a payment, and the value of the property sold may be recovered without resorting to the maker or returning the note. (3 *U. S. Digest,* 122, § 38 ; *Beard vs. Brandon,* 2 *Nott & M'Cord,* 102; *Ramsdell vs. Soule,* 12 *Pick.,* 127 ; *Hughes vs. Wheeler,* 8 *Cow.,* 78 ; *Markle vs. Hatfield,* 2 *Johns.,* 455 ; 1 *Smith's Lead. Cases,* 445, 452.)

VI. This is the rule, unless the property or note passed in payment is of some value. Bank notes are likewise an exception to the rule, for the obvious reason that the party passing them in payment may be able to return them to the person from whom he had received them. (*Conner vs. Henderson,* 15 *Mass.,* 319 ; *Ellis vs. Wild,* 6 *Mass.,* 321.) And in this the signature of the maker of the note was genuine, and notwithstanding the name of the indorser was forged, the note was of some value.

VII. The deposit or delivery of the agreement with Ream & Funk, the "Wyandotte share" and the note, admitting them to have been of value, were not effectual as a payment for the

flour, unless Bemis had actually assigned and transferred them so that Becker & Co. could make them and each of them available for his use. (16 *U. S. Digest*, 492, § 13 ; *Russell vs. Lyttle*, 6 *Wend.*, 390.)

By the Court, BAILEY, J.　Petition in error to reverse the judgment of the United States district court sitting in Douglas county for the trial of causes arising under the laws of the late territory of Kansas, November term, 1860.

The original action was brought in the court below, to recover the sum of fifteen hundred dollars, alledged to have been due to the plaintiffs on the first day of April, 1858, for three hundred and ninety-four sacks of flour, before that time sold and delivered by plaintiffs to the defendant, at his request—plaintiffs claiming judgment for fifteen hundred dollars, with interest on the same from said first day of April, 1858, at the rate of six per cent. per annum.

The petition was filed and summons and order of attachment issued on the 26th day of August, A. D. 1859.

On the 27th day of October, 1859, the defendant filed his answer to said plaintiffs' petition, in which he says that he never purchased the said three hundred and ninety-four sacks of flour of the plaintiffs, or any part thereof, and never promised to pay plaintiffs said sum of fifteen hundred dollars, or any other sum, but *admits*, on the 29th day of March, A. D. 1858, he purchased of one M. W. Delahay, three hundred and ninety-four sacks of flour, for the sum of one thousand five hundred and one dollars and seventy-five cents, and that said flour was delivered to defendant by said Delahay through his agent, Joseph A. Stockton, one of the plaintiffs, and that having, at the time, a promissory note for one thousand five hundred dollars, dated on or about march 12th, 1857, payable one year from date, signed by Robert L. Ream and John M. Funk, it was agreed between himself and said Delahay, that Delahay should take said note in full payment for the

sum of one thousand five hundred dollars, on said purchase of flour, and that the balance due on said flour, being one dollar and seventy-five cents, should be paid in cash, and further, that said defendant should deposit with James Blood, of Lawrence, a certificate for share number one hundred and eighty-nine, in Wyandotte City, and an agreement in writing, entered into between said defendant Bemis, and Ream & Funk, a copy of which is annexed to the answer, the substance of which is, that Bemis agrees to sell said share to said Ream & Funk for one thousand five hundred dollars, and to assign the certificate to them upon the payment of the money, for which said note is given, with authority to said Blood to deliver said certificate of share number one hundred and eighty-nine in Wyandotte City, with the agreement between defendant· and said Ream & Funk in relation ·thereto, to said Delahay in case said note should not be paid.

That said defendant did assign said note in blank, and without recourse, and paid said sum of one dollar and seventy-five cents in cash, and also deposited with said Blood, the certificate of said share, with the agreement in relation to it· aforesaid as agreed. All of which was received and accepted by said Delahay in full payment and satisfaction for said three hundred and ninety-four sacks of flour.

That said flour, so purchased of said Delahay, and so paid for, is the same flour claimed in plaintiffs' petition to ·have been purchased of said plaintiffs.

And defendant avers that Joseph A. Stockton, one of said plaintiffs, was present, and acted as the agent of said Delahay, in the sale of said flour. And so had full knowledge that the flour was purchased from said Delahay, and paid for in the manner stated in the answer.

The following papers were also filed with the answer, viz.:

[COPY.]

Mr. G. F. BEMIS bought of Col. DELHAY

   100 sacks "C" brand flour, @ 3.62½, $362.50

    294 " city brand   "  @ 3.87½, 1,139.25——$1592.75

Rec'd payment by note of ROBT. L. REAM and J. M. FUNK.

                                    J. W. DELAHAY.

Lawrence, March 29th, 1858.        By J. A. Stockton.

[COPY.]

Memorandum of an agreement made this (12th) day of March, 1857, between G. F. Bemis, of Boston, Massachusetts, of the first part, and Robert L. Ream and John M. Funk, of Wyandotte, K. T., of the second part, as follows, to-wit: G. F. Bemis, of the first part, has agreed, bargained and sold to Robert L. Ream and John M. Funk of the second part, one share in Wyandotte City company, number one hundred and eighty-nine, for fifteen hundred dollars. The said Robert L. Ream and John M. Funk give their note, payable twelve months after date, for fifteen hundred dollars, unto George F. Bemis. At the maturity of said note, the said Ream & Funk are to pay over to said Bemis fifteen hundred dollars, and the said Bemis to assign and set over all his right, interest and claim in and to share number one hundred and eighty-nine, Wyandotte City company, unto said Ream & Funk.

On the failure of either of the above named parties complying with above agreement, the party or parties failing to forfeit the sum of five hundred dollars. In testimony whereof the parties have affixed their signatures.

  Signatures:                        G. F. BEMIS,

                                 ROBT. L. REAM,

                                 JOHN M. FUNK.

    Witnesses present:

      G. A. MOORE,

      THOS. H. SWOPE.

By agreement of parties, the case was tried by the court upon the petition answer and evidence, and judgment rendered

for the plaintiffs. Whereupon defendant's counsel moved to set aside the judgment and for a new trial, on the grounds that said judgment was against the law and evidence, which motion was overruled, and the ruling excepted to by defendant's counsel.

The case comes before this court upon a bill of exceptions, setting forth the pleadings, proceedings and evidence.

The errors assigned are as follows, viz. :

First. The court erred in admitting in evidence a certified transcript of a judgment, in which Joseph A. Stockton is plaintiff, and Robert L. Ream and John L. Funk are defendants, and the note upon which said action was brought.

Second. Said court erred in admitting parol testimony of Mark W. Delahay, in relation to the records of the recorder's office, in Leavenworth county, Kansas territory.

Third. The court erred in overruling defendant's motion for a new trial.

Fourth. Said court erred in rendering judgment for said Becker & Co., when judgment ought to have been rendered for said Bemis.

Fifth. That the said judgment was given for said Becker & Co., when it ought to have been given for the said George F. Bemis, according to the law of the land, and the evidence in the case.

From the facts adduced in evidence in this case, there can be no dispute but that the flour for which payment is claimed in plaintiffs' petition, is the same flour which defendant, in his answer, admits to have purchased of Delahay, and claims to have paid for by the note of Ream & Funk. Nor can there be any question but that the contract, whatever it was, and whether in writing or by parol, was made by the defendant in person, on the one part with Joseph A. Stockton, one of the plaintiffs', representing himself as the agent of Delahay, on the other part.

But it is claimed that in point of fact the flour was the property of the plaintiffs, and not of Delahay, and, therefore,

as the "real party in interest," they have the right to sue for and recover payment for it, and they introduce the testimony of Delahay to prove that the ownership of the flour was in them, at the time of the negotiation with Bemis.

To this the defendant objects, on the grounds that the contract was made in writing, and consequently cannot be altered, varied or contradicted by parol evidence. The defendant's reply to this is, that the contract was *not in writing*, but by parol, and that the writing produced, and alleged to be a contract is, in fact only a *receipt*, which may be explained, varied or contradicted. The law on this point is laid down by Parsons as follows, viz.:

"A receipt for money is peculiarly open to evidence. It is only *prima facia* evidence either that the sum stated has been paid, or that any sum whatever was paid. It is, in fact, not regarded as a contract, and hardly as an investment at all, and has but little more force than the oral admission of the party receiving. But this is true only of a simple receipt. It often happens that a paper which contains a receipt or recites the receiving of money or of goods, contains also terms, conditions and agreements or assignments. Such an instrument as to everything but the receipt, is no more to be affected by extrinsic evidence than if it did not contain the receipt; but as to the receipt itself, it may be varied or contradicted by extrinsic testimony, in the same manner as if it contained nothing else."

The defendant contends that the instrument in this case, made and delivered by Stockton, one of the plaintiffs, to Bemis, the defendant, at the time of the transaction, contains all the requisites of a written contract. That it shows who sold and who bought the flour, the number of sacks sold, the different kinds of sacks, the price per sack of each description of flour, and the aggregate value, and also that payment was received in full by note of Ream & Funk.

This view of the case is satisfactory to myself, but it is not accepted by my colleagues.

Without dwelling, therefore, upon this point as in the view we have taken of the case it is not decisive of the rights of the parties, we will consider briefly the question of ownership of the flour.

By the testimony of Delahay, it appears that the flour was purchased at St. Louis for shipment to Kansas, by Becker & Co., upon his (Delahay's,) suggestion, and in part with Delahay's funds. That having a boat at or near Jefferson City, Missouri, built for the Kansas river trade, which he was desirous of freighting to Lawrence, he showed to plaintiffs a paper containing a list of prices current at Lawrence, Kansas, and told them that he thought if a cargo of flour were shipped there, a good thing could be made of it. But as the plaintiffs hesitated about taking the risk, because they could not get a hull insurance, on account of the light build of the boat, he, Delahay, proposed to advance one thousand dollars towards indemnity for the risk, and that after some negotiation, the flour was bought and shipped on board the boat, the bill of lading being in the name of Delahay, insured in the name of Becker & Co., and finally stored at Lawrence, with James Blood, in the name of Becker & Co., without agreement between the parties, that upon the sale of the flour, the one thousand dollars indemnity money should be repaid to Delahay. That Joseph A. Stockton, one of the firm of Becker & Co., who went with the flour to look after the interests of the firm, should be recompensed for his time and expenses, and that after freight, insurance and commissions had been deducted, the balance of the proceeds of the flour should go to Delahay. That both Stockton and Delahay sold of the flour while it remained on storage with Blood, at Lawrence, but that he, Delahay, had no more right than any one else to sell it without the permission of Stockton.

That he was not present at the time of the negotiation between Stockton and Bemis, but returned to Lawrence a day or two afterwards, and was told of it.

Delahay also testified that the suit is brought by the plaintiffs for their own benefit, and that if they fail to recover, it is their loss.

By the testimony of H. M. Simpson, it appears that Bemis and Stockton came into his office at Lawrence, and Bemis, in the presence of Stockton, told witness that he had made a trade with Stockton, and mentioned the fifteen hundred dollars he held against Ream & Funk; that at the request of Bemis, in the presence of Stockton, he made the calculation to see how many sacks of flour, at the prices agreed on, would amount to the face of said note, and found that three hundred and ninety-four sacks, at those prices, would amount to one dollar and seventy-five cents more than the note.

That Bemis said to Stockton, in his, (Simpson's) presence, how do I know that you have authority to sell the flour? To which Stockton replied that Delahay owed plaintiffs over two thousand dollars, but that he, Stockton, would get Blood to accept the order, and that would make Bemis safe. Whereupon Bemis indorsed the note in blank to him, without recourse, and paid him, Stockton, the balance, (one dollar and seventy-five cents) in cash. That Bemis said to Stockton that he was not much acquainted with Ream & Funk, to which Stockton replied that he expected he knew one of them better than Bemis did, and that he did not care what he (Bemis) put upon the back of said note, as he should not look to him for payment. That said Bemis inquired of witness how he should indorse the note so as not to be liable, and was told that he, witness, did not know of any other way than to indorse it without recourse.

That at the same time it was agreed between Stockton and Bemis that the agreement marked "A," annexed to defendant's answer, and the share in Wyandotte City, for which the fifteen hundred dollar note was given, should be deposited with James Blood, and that Stockton drew an order upon Blood for the three hundred and ninety-four sacks of flour in

the name of Becker & Co., which, was accepted by Blood, and the flour delivered to Bemis. At the same time Stockton wrote, signed and delivered to Bemis the receipt or bill of sale, before given    That Bemis and Stockton then left his (Simpson's) office together to go to Blood's, for the purpose of depositing the agreement, marked "A," and city share number one hundred and eighty-nine, so as to enable Ream & Funk to obtain the share on payment of their note.

The testimony of James Blood shows that he accepted an order for the delivery of three hundred and ninety-four sacks of flour, drawn in the name of Becker & Co., in favor of Bemis, and that both Stockton and Bemis were present when the order was presented, and that a Wyandotte City share was deposited with him at the same time, for which he gave the following receipt, viz. :

"Received of J. A. Stockton one share Wyandotte stock, number one hundred and eighty-nine, to be delivered to R. L. Ream and J. M. Funk, on the payment of their joint note of March 12th, 1857, to George F. Bemis or order, for fifteen hundred dollars, ($1,500,) and indorsed by M. W. Delahay, and the surrender of a bond of G. F. Bemis to Ream & Funk for the said share.

" Lawrence, March 29th, 1858."

Blood understood from Stockton that he had made a trade with Bemis, and took the note for fifteen hundred dollars, and states that the share went out of his possession in the fall of 1858, and that he finds the receipt he gave to Stockton in his possession, and does not recollect to whom he gave the share, or that he had seen Bemis since the deposit was made. That witness (Blood) further states that he understood from J. A. Stockton that the flour deposited with him, in the name of Becker & Co., had been purchased on account of Mark W. Delahay, and that the advance made by Becker & Co. for said Delahay, was two thousand two hundred and seventy dollars and seventy-four cents, of which Delahay had paid back six hun-

dred and ten dollars and ninety cents, leaving still due from Delahay on account of said flour, one thousand six hundred and fifty-nine dollars and eighty-four cents, and witness produced a paper writing, which he testified to be in the hand writing of said Stockton, as follows, viz. :

[COPY.]

| Col. Delahay, | |
|---|---|
| To amount of advance | $2,270.74 |
| By amount paid by Col. Delahay, | 610.90 |
| | $1,659.84 |

On being recalled and examined, Delahay testified that he had never requested or authorized plaintiffs to purchase flour on his account, and that they had never pretended to him they had done so.

From these facts, and especially from the repeated representations both written and verbal, made by Stockton, that the flour had been bought on account of Delahay, and that the interest of Becker & Co. was limited by the amount advanced by them in making the purchase, it would seem that whatever claim to the ownership Becker & Co. might be able to asssert as against Delahay, they could hardly be permitted to set up that ownership as against Bemis or any other parties dealing with Delahay, upon the faith of the representations of Stockton, the managing partner of the plaintiffs' firm in this transaction.

But there is, perhaps, no occasion to pursue the discussion of this point, since, in the view we take of the questions yet to be considered, the question of ownership becomes immaterial to the determination of the rights of the parties to this suit.

It is contended by the plaintiffs that the note given by Bemis in exchange for the flour was void, because it was given for a share in Wyandotte City in contravention of chapter one hundred and fifty-six of the statutes of 1855, entitled " an

act concerning the plats of towns and villages." The act, so far as it relates to this case, is as follows, viz.:

SECTION 1. "Whenever any town or village or any addition to any town or village shall be laid out, the proprietor or proprietors of such town or village or addition, shall cause to be made out an accurate map or plat thereof, particularly setting forth and describing, first, all the parcels of ground within such town, village or addition, reserved for public purposes, by their boundaries, course and extent, whether they be intended for avenues, streets, lanes, commons or other public uses, and, second, all lots intended for sale by numbers, and their precise length and width.

Sections two, three and four, provide that such maps or plats seall be acknowledged by such proprietor, and deposited and preserved in the office of the recorder of the county in which such town, &c., is situated.

SEC. 5. If any person sell or offer for sale any lot within any town, village or addition, before the map or plat thereof be made out, acknowledged and deposited, as aforesaid, such person shall forfeit a sum not exceeding three hundred dollars for every lot which he shall sell, or offer to sell, *provided*, that this section shall, in nowise, apply to towns and villages heretofore laid out, &c.

The illegality complained of in this case is, that the Ream & Funk note was given for "a share" in Wyandotte City, be-. fore a plat of said Wyandotte City had been deposited in the recorder's office of Leavenworth county, in which it was situated.

The certificate issued to Bemis by the company, and which Bemis agreed to assign to Ream & Funk in consideration of their note and on payment thereof, was as follows:

[COPY.]

WYANDOTTE CITY COMPANY: This certifies that G. F. Bemis is entitled to one share of ten lots, (numbered as per records and indorsements) in the city of Wyandotte, situated

at the confluence of the Kansas and Missouri rivers, in the Wyandotte purchase, Kansas territory, subject to the conditions of improvement within the city limits to the value of ——— dollars per share, within ——— months from the date of this certificate, and the Wyandotte City company is here by pledged to give a good and valid deed of the same when all the lots shall have been drawn and the above conditions complied with. Timber reserved.

WYANDOTTE CITY, Kansas Territory, — A. D. 1857.

——————, President.

———, Secretary.

To prove that the plat of Wyandotte had never been recorded in Leavenworth county, plaintiffs introduced the testimony of Delahay, that he had examined the records of the recorder's office of that county, and did not find the plat of record there, which was objected to on the part of defense, but admitted by the court.

We need only say on this point that, if admissible, it was necessarily unsatisfactory and inconclusive.

The plaintiffs then introduced a certificate signed by the register of deeds of Leavenworth county, to the effect that he had examined the records of his office, and found on record a plat of a part of Wyandotte City, acknowled by H. M. Northrup as owner, and not otherwise described, which was acknowledged 28th of June, 1858, and recorded July 3d, 1858, and that there was no other plat on file or of record relating to the city of Wyandotte, that he could find.

The reception of this certificate was objected to, but the objections were overruled and the paper admitted as evidence. By the rules of evidence we think the paper inadmissible. "In general, a certificate of mere matter of fact, not coupled with any matter of law, is not receivable in evidence." (2 *Phillips on Evidence*, 125.)

The defendant's counsel then offered in evidence the certificate of the register of deeds of Wyandotte county, to the effect

that on the 14th "day of May, 1857, Silas Armstrong, president of the Wyandotte City association, filed in the recorder's office of the county of Leavenworth, a plat of Wyondotte City, Kansas territory, acknowledged before a justice of the peace for said county of Leavenworth, by said Armstrong, as president of said association, which said plat was afterwards, by reason of the establishment of the county of Wyandotte, transferred to the register of deeds of said county of Wyandotte, and is now preserved among the records thereof." This certificate was objected to by plaintiffs' counsel, but admitted by the court.

We think that the same rule of law which excludes the certificate from the register of deeds of Leavenworth county, is applicable to this also.

Both certificates were adduced in proof of mere matters of fact, namely: in the one case that there was, and in the other that there was not, a copy of the map or plat of Wyandotte among the records of the county.

But the mere fact that there was a copy of the plat among the records of Wyandotte county, would not show that the requirements of the town plat law had been complied with.

The certificate, if admitted and uncontradicted, would only show that a paper purporting to be "a plat of Wyandotte City, Kansas territory," had been deposited as therein set forth, while the statute requires that such plat should set forth and describe the several streets, parks and alleys reserved for public purposes by their boundaries, course and extent, and all lots intended for sale by numbers, and their precise length and width.

These essential particulars the certificate did not and could not show.

The party desiring to prove them must adduce the best evidence for that purpose, which would seem to have been the plat itself, produced in court by the proper custodian of the records, with which it was required to have been deposited.

In the absense of any proof showing that the plat had been duly acknowledged, certified and deposited in the recorder's office, as required by the statute, the first question presented for our consideration is this: Was the issuing of that share a *sale* of *lots*, or an offer to sell lots? We are clearly of opinion that it was not. A sale imports a present conveyance. The certificate in question is, upon its face, an agreement, contract or pledge, to convey at a future time.

But, again, if it was a sale of lots, what lots were sold, or offered for sale? Unquestionably, had such sale been punishable by indictment, an indictment for the sale of a share of ten lots without describing them, would have been bad.

Again it is objected that if the share does not specify any lots, it is void for uncertainty. This objection we must deem ill founded, for though a deed of a share of ten lots in a town without describing them, would clearly be void for uncertainty, yet an agreement to make a deed of ten lots would be good and binding, because what was uncertain in the agreement would be made certain by the deed, and a deed conveying any ten lots in the town named, would satisfy the conditions of the agreement.

Besides, by the terms of the certificate, the lots belonging to the share were to be designated and ascertained before the legal title was to be conveyed to the shareholder by being drawn.

Passing from this point we proceed to the discussion of one more serious, whether a note given for lots in the city of Wyandotte is void under this statute.

We remark, in the first place, where one state borrows or adopts a law from another, it is well settled that the judicial construction given to the statute in the state where it originated follows it to the state of its adoption.

The Kansas town plat law of 1855 is identical with the statute of Missouri upon the same subject, and was adopted entire from the Missouri statute book.

Whatever construction, therefore, had been given to that statute by the courts of Missouri, must be presumed to have been known and approved by the legislature of Kansas territory, when they incorporated that act into the body of Kansas laws.

We find that the supreme court of Missouri, prior to the enactment of this law by the Kansas legislature, had decided that such sale of lots, before the plat had been deposited in the recorder's office, *was not void, but that the title in the lots sold passed to the vendee.* (*Mason vs. Pitt,* 21 *Mo. R.,* 391.)

And again, the town plat law of Ohio, which was nearly identical with that of Missouri, had received a judicial construction in exact accordance with that given to the Missouri act by the courts of that state.

In the case of *Strong vs. Darling,* (9 *Ohio R.,* 201,) the supreme court of Ohio held that a contract for the sale of a town lot was valid, although the town had not been surveyed, platted and recorded according to the provisions of the Ohio statute, and that a statutory imposition of a mere penalty upon the performance of an act, does not necessarily vitiate the contract itself.

These authoritative decisions, the one upon the same identical statute, and the other upon a statute almost identical, and upon the same subject matter, might well be deemed conclusive, but the conclusion arrived at in those cases, is most strongly fortified by more recent decisions in the supreme court of the United States, and the court of appeals of the state of New York.

The same question in substance has been adjudicated by the supreme court of the United States in the case of *Harris vs. Runnels,* (12 *How.,* 80,) after elaborate argument and upon the fullest consideration. In that case the court held that "where a statute of Mississippi declared that slaves should not be brought into the state without a previous certificate, signed by two freeholders, with a certificate of the clerk of

the county from which they came, certifying that the signers were respectable freeholders, and slaves were brought in without such certificate and sold, the contract is not void, but the purchaser must pay his note given for the purchase money." And that "where a defendant, when sued upon a note, sets up as a defense that the note was given for an illegal consideration, the whole statute must be examined in order to discover whether or not the legislature *intended* to prevent courts of justice from enforcing contracts relating to the act prohibited."

In other words, that contracts in contravention of a statute, are not to be held void, unless the court, from an examination of the statute, shall judge such to have been the intent of the legislature, though such intent will be presumed unless the contrary can be fairly inferred.

We find, on examination of the statute in question in this case, that the manifest object of it was to protect the public and the unsuspecting purchaser against shams and devices of unscrupulous town projectors and proprietors and other persons, by the imposition of a penalty sufficient, in the judgment of the legislature, to secure conformity to its provisions.

It is enacted in the sixth section that such map or plat, so acknowledged, certified and deposited in the recorder's office, shall be a sufficient conveyance to vest the fee of such lands therein named as intended for public uses, as streets, parks, &c., in the county, for the use of the public, and to enforce such acknowledgement and deposit of the plat. The act provides a penalty or forfeiture of three hundred dollars for every lot sold previous to the deposit of such plat.

Non-compliance with the requirements of the act is not made a misdemeanor, punishable by fine, nor is it indictable in the courts. But the penalty is, by the eighth section, to be recovered by action of debt for the use of the county.

There is certainly no rule of ethics or principle of common law against the selling of lots in a town without depositing a

map thereof in the recorder's office of the county; the offense therefore, is precisely of the nature, form, proportions and extent which the legislature has declared.

By that authority, and that alone, the act is made penal; and although the words in the fifth section are that "any person" who shall sell or offer for sale such lots shall forfeit three hundred dollars. Yet as it can hardly be presumed that the legislature intended to impose the penalty upon any except those upon whom it imposes the duty of acknowledgeing and depositing the plat, we are inclined to the opinion that the words, "any person," in the fifth section, are to be construed in connection with and limited by the provisions of the first section which creates the duty.

The same power then, which creates the offense provides the penalty and designates the offenders.

The contrary interpretation contended for by the defendants in error would confound the innocent with the guilty—subjecting them alike to the penalties of the act, and make it, instead of a protection to the credulous and unsuspecting, a trap and a snare for the feet of the unwary.

This view is confirmed by referring to the ninth section of the act which provides that the property and effects of the person incurring such forfeiture may be proceeded against by attachment or otherwise in like manner and for the like cause as in ordinary cases of debt.

It surely cannot be supposed that the legislature intended to impose penalties upon innocent parties, selling without knowing the existence of the act, or of the non-compliance with its provisions, when they expressly place it as to known and deliberate offenders, upon the basis of an ordinary case of debt.

Besides, we may remark that the proviso in the fifth section of the act—the same which imposes the penalty—declares that this section *shall, in no wise, apply to towns and villages heretofore laid out,* &c.

Now, in the absense of any allegation or averment in the defendant's answer, and of all proof, how can the court determine whether the town of Wyandotte was laid out before or since the passage of the act?

The view we have taken of the law as to contracts, in contravention of statutes, is fully sustained by the recent case of the *Oneida Bank vs. the Ontario Bank*, decided in the court of appeals of New York.

In that case, the denfendant bank had issued certain post dated drafts directly contrary to the provisions of a statute of New York, which drafts were negotiated to the plaintiff. The suit was brought to recover the amount of them, and the court held that the legislature might prohibit such contracts and punish the guilty parties, and yet leave the contract to stand in favor of innocent persons not included in the terms of the prohibition. (*See* 21 *N. Y. R.*, 490.)

It is also confirmed by the recent decision of the United States, in the case of *Fackler vs. Ford*, which was an appeal from the supreme court of Kansas territory. In that case, Fackler had entered into a written contract to convey to Ford two hundred and forty lots in *Fackler's addition* to the city of Leavenworth, which was laid out upon lands conveyed in trust to the United States by the Delaware Indians, and to be sold for their benefit. Fackler was to purchase the lands from the government at the, public sales, and having done so to convey the lots specified to Ford, for ten thousand dollars, in addition to the amount paid to government for the land. He did purchase the lands as agreed, but refused to convey, whereupon Ford brought his bill in equity, praying for a specific performance.

Fackler filed his answer, admitting the contract, but alleging that no plat of the "addition" had been filed in pursuance of the statute above cited; that the agreement, settlement, survey and platting of the land was a *fraud* upon the Indians, of which complainants were cognizant, and was in violation

of the public policy and statutes of the United States, and void. The court ordered these allegations to be expunged from the answer; thus leaving in the answer nothing but an admission of the contract, as set forth in complainant's bill, and decreed the specific performance as prayed for.

This ruling and decree were sustained by the supreme court of the territory, and afterwards went up on appeal to the supreme court of the United States.

In that court the case was argued for the appellant by able counsel, who contended that the contract was directly in contravention of the fourth and fifth sections of the act of congress of 31st of March, 1830, entitled "an act for the relief of purchasers of public lands, and for the suppression of fraudulent practices at the public sales of the lands of the United States."

The fourth section of that act imposes a fine of one thousand dollars, or two years' imprisonment, or both, upon any person who shall, before or at the time of the public sale of any lands of the United States, bargain, contract or agree or attempt to bargain, contract or agree with any other person or persons "not to bid upon or purchase lands offered for sale, or any part thereof," or should, "by combination or unfair management, hinder or prevent any person from bidding," &c.

The fifth section enacts:

That if any person or persons shall, before or at the time of the public sale of any of the lands of the United States, enter into any contract, bargain, agreement, or secret understanding with any other person or persons proposing to purchase such lands, or pay or give such purchaser for such lands a sum of money or other article of property, over and above the price at which the land may or shall be bid off by such purchaser, every such contract, bargain or agreement, or secret understanding, and every bond, obligation or writing,

of any kind whatsoever, founded upon or growing out of the same *shall be utterly null and void.*

The supreme court of the United States affirmed the decision of the supreme court of the territory, holding that "the fifth section is evidently intended for the protection of those who propose to purchase lands at the public sales, from the extortions of those who have formed the combinations made penal by the fourth section." But that "it is no part of the policy of this section to encourage frauds by releasing the fraudulent party from the obligation of his contract."

Ordered by the court, that the judgment rendered in this cause in the court below be reversed, and the cause remanded for a new trial.